1   BARRY J. PORTMAN
    Federal Public Defender
2   RONALD C. TYLER
    Assistant Federal Public Defender
3   450 Golden Gate Avenue
    San Francisco, CA 94102
4   Telephone: (415) 436-7700

5   Counsel for Defendant PERRY

6               IN THE UNITED STATES DISTRICT COURT

7             FOR THE NORTHERN DISTRICT OF CALIFORNIA

8

9   UNITED STATES OF AMERICA,          )   No. CR 07-0739 CRB
                                        )
10                  Plaintiff,          )   **DEFENDANT'S SENTENCING**
                                        )   **MEMORANDUM**
11                                      )
            v.                          )
12                                      )
                                        )
13                                      )
    HAKEEM PERRY,                       )
14                                      )
                    Defendant.          )
15  _____ )

16

17

18

19

20

21

22

23

24

25

26

# TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    I.       Hakeem Perry's Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

                A.    California's Approach to Mental Health Treatment . . . . . . . 3

                B.    Hakeem Perry's Extensive History of Short-Term Treatment  4

                C.    Events Leading to the Assault . . . . . . . . . . . . . . . . . . . . . . . . . 5

                D.    Most Recent Evaluation and Recommendation by Dr. Jeremy Coles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

    I.       THE SENTENCING ENHANCEMENT FOR AN "OFFICIAL VICTIM" SHOULD NOT BE APPLIED TO MR. PERRY. . . . . . . . . . . . . . . . . . . . . . . . 8

                A.    The Official Victim Enhancement Only Applies if the Offense Conduct was Motivated by the Victim's Status, Rather Than Where Such Status was Incidental to the Conduct. . . . . . . . . 8

            B.    Mr. Perry's Offense Conduct Was Not Clearly Motivated By The Victim's Status As An Employee Of The City And County of San Francisco.  . . 11

    II.      THE COURT SHOULD IMPOSE A SENTENCE OF TWELVE MONTHS IN LIGHT OF ALL STATUTORY GOALS OF SENTENCING, INCLUDING THE NEED FOR TREATMENT. . . . . . . . . . . . . . . . . . . . 13

                A.    The Court Has the Discretion to Impose a Sentence Based on All Statutory Goals, Not Merely Based on the Advisory Guidelines.

                    . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

                B.    A Twelve-Month Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Deterrence and Protect the Public While Not Becoming Counterproductive in Light of Rehabilitation and Other Sentencing Goals.  . . . 14

                C.    Structured, Long-Term Treatment is the Most Important Component of the Sentence the Court Should Impose. . . . . . 15

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

1

2                            **TABLE OF AUTHORITIES**

3                               **FEDERAL CASES**

4    *United States v. Adelman*, 168 F.3d 84 (2d Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

5    *United States v. Talley*, 164 F.3d 989 (6th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . .   10, 11

6    *United States v. Alexander*, 287 F.3d 81 (9th Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

7    *United States v. Booker*, 543 U.S. 220, 125 S. Ct. 738 (2005) . . . . . . . . . . . . . . . . . . . . . .   13

8    *United States v. Cantrell*, 433 F.3d 1269 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

9    *United States v. Garcia*, 34 F.3d 6 (1st Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

10   *United States v. Hooker*, 997 F.2d 67 (5th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

11   *United States v. McAninch*, 994 F.2d 1380 (9th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . . . . . .   9

12   *United States v. Mohamed*, 459 F.3d 979 (9th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . .   13

13   *United States v. Polk*, 118 F.3d 286 (5th Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

14   *United States v. Powell*, 6 F.3d 611 (9th Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   10

15   *United States v. Sanchez*, 914 F.2d 1355 (9th Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . .   9, 10

16   *United States v. Williams*, 520 F.3d 414 (5th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . .   11

17                             **FEDERAL STATUTES**

18   18 U.S.C. § 3553 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   14

19   Title 18 U.S.C. § 3553(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   13, 14

20                              **STATE STATUTES**

21   Cal.Welf. & Inst. Code Sec. 5008(h)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

22   Cal.Welf. & Inst. Code Sec. 5150 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

23   Cal.Welf. & Inst. Code Sec. 5250 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

24   Cal.Welf. & Inst. Code Sec. 5260 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

25   Cal.Welf. & Inst. Code Sec. 5270.15 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   3

26   Cal.Welf. & Inst. Code Sec. 5304 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   4

Cal. Welf. & Inst. Code Sec. 5350 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

1  BARRY J. PORTMAN
   Federal Public Defender
2  RONALD C. TYLER
   Assistant Federal Public Defender
3  450 Golden Gate Avenue
   San Francisco, CA 94102
4  Telephone: (415) 436-7700

5  Counsel for Defendant PERRY

6

7                  IN THE UNITED STATES DISTRICT COURT

8                FOR THE NORTHERN DISTRICT OF CALIFORNIA

9

10  UNITED STATES OF AMERICA,          )   No. CR 07-0739 CRB
                                       )
11              Plaintiff,             )   **DEFENDANT'S SENTENCING**
                                       )   **MEMORANDUM**
12                                     )
         v.                            )
13                                     )
                                       )
14                                     )
    HAKEEM PERRY,                      )
15                                     )
                Defendant.             )
16  _____)

17                           **INTRODUCTION**

18         Hakeem Perry is a seriously mentally ill young man. After years of deteriorating mental

19  health, he now stands before the Court for sentencing after pleading guilty to felony assault. Any

20  sentence imposed should carefully balance both the need to protect society and the critical, ongoing

21  need to provide Mr. Perry with rehabilitative treatment for his benefit and the benefit of the

22  community.

23         As articulated at the outset of the Argument section below, one of the sentencing factors, the

24  advisory guidelines, should be calculated differently than in the final PSR. The final offense level

25  should be 16, rather than the higher level in the final PSR. The resulting advisory range is 27 to 33

26

DEF. SENT MEM.
No CR 07-0739 CRB                      -1-

1  months.  Taking into account the various statutory goals, Mr. Perry asks that the Court impose a

2  sentence of twelve months in custody, followed by at least twelve months of residential psychiatric

3  treatment, as a condition of three years of supervised release.

4         In addition to the matters set forth below, Mr. Perry commends to the Court's attention the

5  compelling letters from his mother, grandmother, grandfather and aunt, attached to Declaration of

6  Ronald Tyler Authenticating Documents (hereinafter, "Tyler Auth. Dec") as Exhibit D.

7                                  **STATEMENT OF FACTS**

8  I.     **Hakeem Perry's Background**

9         Hakeem Perry is now 23 years old.  He has suffered from a serious mental disorder marked by

10  schizophrenia and major depression for many years.  Psychologist Jeremy Coles, who examined Mr.

11  Perry and reviewed thirty-five historical psychiatric documents, has concluded that his illness is

12  biologically rooted, though undoubtedly exacerbated by a horrible childhood disaster.  Report of

13  Psychological Evaluation of Jeremy Coles, Ph.D. (hereinafter, "Coles Report"), attached to

14  Declaration of Ronald Tyler Authenticating Documents (hereinafter, "Tyler Auth. Dec") as Exhibit A.

15  Hakeem's mother traces his problems to the traumatic death of his brother, Jamaal.  When Hakeem

16  was nine, he witnessed Jamaal accidentally hang himself with a belt and die.  *See* Exhibit D to Tyler

17  Auth. Dec.  Hakeem received only a brief period of counseling, for this trauma.  He would not talk

18  about it and the therapist simply terminated the sessions, to his mother's lasting dismay.  *Id.*

19         Over the course of Hakeem's pre-adolescence, his mother struggled to raise him and his

20  younger sister, in the absence of their father.  His mother recalls that, after years of seeming

21  quiescence, Hakeem unexpectedly began exhibiting signs of mental illness when he turned fourteen.

22  *Id.*  Hakeem, himself, recalls being treated for depression and hallucinations as early as age five.  He

23  also recalls childhood hallucinations and suicide attempts, though his memory is suspect given his

24  mental illness and the dearth of supporting documentation.  See Coles Report.  He also recalls being

25  picked on a lot as a youngster and feeling socially isolated.  *Id.* at 3.

26

DEF. SENT MEM.
No CR 07-0739 CRB                         -2-

1    Over the course of the last six years, Hakeem's mother has watched his mental health
2    deteriorate to the point that she no longer recognizes him as her son. *See* Exhibit D to Tyler Auth.
3    Dec. In the two years before this federal case, Hakeem was repeatedly hospitalized for acute
4    psychotic episodes. *See* Coles Report at 6-8.  Over that same time frame, he began to engage in
5    increasingly aggressive behavior, resulting in brief periods of incarceration. *See* PSR ¶ ¶ 34-36.

6    **A.    California's Approach to Mental Health Treatment**

7    In order to best understand Mr. Perry's treatment history, it is helpful to briefly summarize the
8    nature of California's mental health treatment laws.  Involuntary treatment of mentally ill persons in
9    this state is governed by the Lanterman-Petris-Short Act ("LPS"), California Welfare and Institutions
10   Code Section 5000 et. seq.  LPS creates a tiered system of treatment of increasing length, with
11   increasing rights of the involuntarily detained person.

12   **72 -hour evaluation.**  If a person is determined by police or mental health professionals to be
13   a danger to himself or others, or gravely disabled, he may be detained for evaluation and treatment for
14   72 hours.[1]  Cal.Welf. & Inst. Code Sec. 5150.

15   **14-day intensive treatment**.  The 72-hour period may be extended for an additional 14 days
16   of intensive treatment, if mental health professionals determine that a person continues to be a danger
17   to himself or others, or is gravely disabled.  Cal.Welf. & Inst. Code Sec. 5250.

18   **Additional 14-day intensive treatment**.  An additional 14-day period of intensive treatment
19   is possible, if the person in treatment was previously suicidal and continues to present an imminent
20   suicide threat.  Cal.Welf. & Inst. Code Sec. 5260.[2]

21   **360 days of intensive treatment**.  A person may be held for further treatment for up to two
22
23   [1]A person is deemed gravely disabled if he or she has been found to be mentally incompetent
     to stand trial, or is unable to provide for basic personal needs for food, clothing or shelter. Cal.Welf.
24   & Inst. Code Sec. 5008(h)(1)(A).

25   [2] Under some circumstances, an additional 30-day intensive treatment period may be
     provided, if the person is determined bo be gravely disabled and is either unable or unwilling to
26   accept treatment.  Cal.Welf. & Inst. Code Sec. 5270.15

DEF. SENT MEM.
No CR 07-0739 CRB                                    -3-

180-day periods if, for example, the person was taken into custody after inflicting physical harm upon another person and he presents a demonstrated danger of substantial physical harm to others. The second such period is only permissible if a court finds that the person continues to present a danger to himself or others. Cal.Welf. & Inst. Code Sec. 5304.

**Conservatorship.** As a final step, the LPS Act provides the possibility of conservatorship, but only of a gravely disabled person. However, the proposed conservatee has the right to demand a jury trial, with the concomitant right to appointed counsel. Cal.Welf. & Inst. Code Sec. 5350.

**B.    Hakeem Perry's Extensive History of Short-Term Treatment**

By 2007, Mr. Perry's condition was at its nadir. There were only two months of the year when he was not in some sort of psychiatric treatment. Id. The table that follows presents an excerpt of his recent, documented treatment history. In spite of the tiered LPS Act options, Hakeem routinely received only a few days care at a time. *See* Coles Report at 6-8.

| Date | Facility | Reason for Admission | Diagnosis |
|---|---|---|---|
| 1/3//06-1/9/06 | Alameda County Medical Center  Psychiatric Emergency Service | Attempted to jump from car; attempted to hit brother. Internally preoccupied, laughing inappropriately. | Impulse Control Disorder; Substance Induced Disorder with perceptual disturbance |
| 3/20/07 | Alameda County Medical Center  Psychiatric Emergency Service | 5150 Hold; Suicidal ideation; depressed and paranoid. Hakeem requested long-term facility (Villa Fairmont). | Schizoaffective Disorder |
| 3/21/07-3/30/07 | Fremont Hospital | Paranoid and auditory hallucinations. | Schizophrenia, paranoid type |
| 3/31/07-4/3/07 | Fremont Hospital | Paranoid and auditory hallucinations of a suicidal nature. Symptoms worsened when meds stopped. | Psychosis NOS |

| | | | |
|---|---|---|---|
| 4/9/07-4/17/07 | Telecare Heritage Psychiatric Health Facility | 5150 Hold; Gravely disabled; suicidal; stopped taking meds after last discharge. Hakeem requested long-term facility (Villa Fairmont). | Schizoaffective Disorder |
| 4/18/07-4/30/07 | Kaiser Hospital | Depression and suicidal thoughts; auditory hallucinations; stopped meds; Hakeem requested long term facility (Villa Fairmont). | Schizoaffective Disorder |
| 7/9/07 | Kaiser Hospital | Depression and auditory hallucinations | Schizoaffective Disorder |
| 8/29/07-9/18/07 | Casa Rohnert Park State Hospital | history of auditory hallucinations and paranoia. | Psychotic Disorder NOS |
| 10/2/07-10/8/07 | Fremont Hospital | suicidal thoughts; auditory hallucinations; stopped meds after previous discharge | Schizophrenia, chronic paranoid type; discharged to board and care facility. |
| 10/16/07 | Telecare Heritage Psychiatric Health Facility | auditory hallucinations of a suicidal nature. | Schizoaffective Disorder |
| 10/17/07-10/18/07 | Fremont Hospital | suicidal thoughts; auditory hallucinations | Schizophrenia, chronic, undifferentiated |
| 10/19/07-10/22/07 | John George Psychiatric Pavilion | auditory hallucinations; internally preoccupied; loose and disorganized; paranoid with persecutory ideation. | Schizophrenia, paranoid type; |

## C.    Events Leading to the Assault

As shown above, by mid October 2007, Hakeem Perry was unraveling.  On October 18, the very day that he left Fremont Hospital, he was arrested and placed in psychiatric custody, after

1 allegedly attacking a BART patron. *See* Coles Report at 8; PSR ¶ 40 (erroneous listing date as

2 October 28, 2007). His reported symptoms upon admission to John George were more numerous

3 than ever and his paranoia seemed particularly acute. Clinicians assessed him as a danger to himself

4 or others and prescribed Zyprexa and Ativan.

5      Over the course of the next few days, Mr. Perry improved, somewhat, due to the stabilizing

6 effect of the medication. On the second day of his treatment, a John George psychiatrist assessed him

7 to be at continuing risk of assaultive behavior. Alameda County Medical Center, John George

8 Pavilion Progress Report, attached to Tyler Auth. Dec. as Exhibit B. The psychiatrist advised

9 extending treatment by placing a 14-day hold, per California Welfare and Institutions Code Section

10 5250, and maintaining the psychiatric medications. *Id.*

11      Instead of being kept at John George, one day later, on October 22, Mr. Perry was released to

12 Santa Rita Jail. At discharge, when he was asked for an explanation for the alleged assault of the

13 BART patron, Mr. Perry could only say that such things happen when he is not on medication.

14 Alameda County Medical Center, John George Pavilion Discharge Report, attached to Tyler Auth.

15 Dec. as Exhibit C. In spite of the fact that he had so recently exhibited such significant signs of

16 paranoia with persecutory ideation, he was given no medications whatsoever at the time of discharge.

17 The discharging psychiatrist simply noted, "[T]he next facility can prescribe medications." *Id.*

18      About two weeks later, on November 7, 2007, Hakeem Perry appeared in San Francisco. He

19 was unmedicated and apparently experiencing auditory hallucinations – ominously now accompanied

20 by visual hallucinations. *See* Coles Report at 8. He rode a bus out to the end of the line, at Baker

21 Beach. He asked the driver to call the police or medical personnel or to drive him to a hospital.

22 When the driver refused, Mr. Perry seriously assaulted him. *See* PSR ¶¶ 6-10.

23      After his arrest, on November 8, 2007, Mr. Perry was again taken to a psychiatric facility, at

24 San Francisco General. He was observed exhibiting his familiar symptoms of internal preoccupation

25 and auditory hallucinations, together with the new symptom of visual hallucinations. The doctors

26

issued the usual diagnosis of schizophrenia, paranoid type. *See* Coles Report at 8.

**D.    Most Recent Evaluation and Recommendation by Dr. Jeremy Coles**

During his current incarceration at Santa Rita Jail, Mr. Perry was examined by Psychologist Jeremy Coles. The full report is attached for the Court's review.

Dr. Coles has provided a helpful opinion regarding Mr. Perry's mental state at the time of the offense:

> While Mr. Perry's report to this examiner regarding his thought process at the time of this crime was generally non-illuminating, his history is quite clear regarding his paranoia and poor reality testing, his suspicion of others, etc. His psychosis is marked by significant feelings of persecution that vacillate between self-persecution leading to suicidality and external persecution that causes him to view others as a areal threat . . . Unfortunately, the victim of his controlling offense, the bus driver, became the focal point of Mr. Perry's paranoia, came to be seen as a threat, and was injured in the process. It is my opinion that Mr. Perry's Schizoaffective Disorder was significantly related to his commission of the controlling offense in that it substantially impaired his thought, perception of reality, emotional process, and judgment, thereby leading to the violent behavior that he exhibited at the time.

Coles Report at 11.

More importantly, as a psychologist practicing in this community, Dr. Coles raises troubling concerns regarding Mr. Perry's past mental health treatment:

> Mr. Perry's psychiatric hospitalization history over the past two years highlights the utter failure of the existing mental health apparatus to effectively deal with an individual such as Mr. Perry who expresses a desire for treatment and also a significant resistance to treatment. His revolving door of psychiatric admissions is quite common for individuals whose mental illness is marked by paranoia and suicidality . . . Here it is worth noting that Mr. Perry's record contained several entries that document his self-declared desire to go to Villa Fairmont, a locked, long-term facility in Alameda County. If he had been afforded this opportunity, his controlling offense could have been avoided . . . Having done psychological testing at Villa Fairmont as well as having placed people in this facility, it is my opinion that he was very appropriate for this program.

*Id.* at 11-12.

Finally, Dr. Coles provides a carefully considered recommendations regarding sentencing and future treatment. He begins with the unsurprising conclusion that Mr. Perry will need ongoing monitoring and treatment for the rest of his life. As for the near-term imprisonment and future

DEF. SENT MEM.
No CR 07-0739 CRB                    -7-

supervision, he concludes as follows:

> Mr. Perry will not fair well in the general population of any prison setting and, given his propensity for suicidal ideation and psychosis, would likely regress to a state of suicidality in very short order. It is my opinion that he will need to be treated in a skilled psychiatric setting in prison that will provide ongoing care for him and will not continue the pattern that was set up in the community whereby any time that Mr. Perry is doing slightly better, he is allowed to rely on himself to get his treatment needs met.

> Once released to the community, Mr. Perry should be provided with a structured long-term residential setting that will provide him with complete psychiatric services as well as transitional services aimed at integrating him into the community . . . It is absolutely essential that Mr. Perry not be subjected to the revolving door of the mental health system. For all of the reasons illuminated above, he does not respond well to such a system and is in need of far more structured and intensive psychiatric care. To date, he has not received such care and it is my deep hope that his future holds more than a simple repetition of the past.

*Id.* at 12.

## ARGUMENT

**I.    THE SENTENCING ENHANCEMENT FOR AN "OFFICIAL VICTIM" SHOULD NOT BE APPLIED TO MR. PERRY.**

**A.    The Official Victim Enhancement Only Applies if the Offense Conduct was Motivated by the Victim's Status, Rather Than Where Such Status was Incidental to the Conduct.**

Section 3A1.2 of the Sentencing Guidelines provides that a defendant's base level should be increased "if (1) the victim was [] a government officer or employee . . . and (2) **the offense of conviction was motivated by such status**." U.S.S.G. § 3A1.2(a) (emphasis added). According to the commentary, "'Motivated by such status,' . . means that the offense of conviction was motivated by the fact that the victim was a government officer or employee . . . ." U.S.S.G. § 3A1.2, comment. (n. 3).

The Ninth Circuit has consistently approved application of § 3A1.2 enhancements in cases where the defendant's conduct was motivated by the victim's status, rather than where that status was merely incidental to the conduct at issue. Consequently, the run of the mill case involves conduct directed towards prison guards, police officers, or elected officials.

1

2     For example, in *United States v. McAninch,* 994 F.2d 1380, 1386 (9th Cir. 1992), the

3   defendant was convicted of sending threatening letters to then-President Bush.  One of the letters

4   threatened to kill the President if he did not end "the imperial aggression against the Iraqi people." *Id.*

5   at 1384.  At sentencing, the district court departed upwards by three levels under the applicable

6   Guideline Section 2A6.1, analogizing to § 3A1.2.  The defendant appealed, arguing that his conduct

7   was not motivated by the President's status.  The Ninth Circuit affirmed the sentence.

8     First, the Circuit found that the "motivated by victim's status" language did not apply to §

9   2A6.1, the guideline under which the defendant was sentenced.  More importantly for present

10  purposes, the Court also concluded that, even if the "motivated by victim's status" language were to

11  apply, it was undoubtedly met: "President Bush's official status *was not incidental to the conduct at*

12  *issue* . . . McAninch in his threatening letter obviously referred to the President's official duties." *Id.*

13  at 1386 (emphasis added).

14    *United States v. Sanchez,* 914 F.2d 1355 (9th Cir. 1990), further demonstrates that the § 3A1.2

15  enhancement is properly applied only where the victim's status is not incidental to the defendant's

16  conduct (though this was not the Court's explicit holding).  In *Sanchez,* the defendant failed to stop

17  his car after a Border Patrol officer activated his marked vehicle's flashing lights and pursued the

18  defendant.  When the defendant's car became lodged on railroad tracks, the officer left his vehicle,

19  identified himself as a Border Patrol agent and commanded the defendant to get out of his car.

20  Instead, the defendant dislodged his car and drove straight at the officer, ramming the patrol car.

21  When finally confronted on foot after a further pursuit, the defendant proclaimed, "I'm no wetback,"

22  and hit the officer in the chest. *Id.* at 1357.  The defendant appealed his conviction and sentence for

23  assault on a federal officer.

24    The Ninth Circuit upheld the district court's determination "that [the defendant] knew [the

25  victim] was a federal officer and that the assault was motivated by that knowledge." *Id.* at 1363.

26

DEF. SENT MEM.
No CR 07-0739 CRB                                   -9-

Accordingly, the appellate panel also upheld application of the § 3A1.2 official victim enhancement. *Id.* Inherent in the court's reasoning was the conclusion that the victim's status as a federal officer was not incidental to the defendant's assaultive conduct.

Recent Ninth Circuit case law is consistent with the above principle, approving of application of the § 3A1.2 enhancement in cases where the conduct was directly motivated by the victim's status. *See e.g., United States v. Alexander,* 287 F.3d 81, 820 (9th Cir. 2002) (victims were members of the Montana Supreme Court Commission on Practice, which oversaw defendant's disbarment from the State Bar).[3]

The Ninth Circuit is not alone in this interpretation of the § 3A1.2 enhancement. Other Circuits have only applied the enhancement to cases where the offense of conviction was not incidental to the conduct at issue. In *United States v. Adelman,* the Second Circuit ruled that because the defendant's threats to the judge were motivated by the judge's official position, the sentencing court did not err in enhancing defendant's offense level. *Adelman,* 168 F.3d 84, 86 (2d Cir. 1999). The record established that the defendant called the Marshall Service and "specifically identified" the judge. *Id.* The record also reflected that the defendant had previously been convicted and sentenced by the same judge. *Id.* at 85. Taking this into account, the court held that "record support[ed] the court's finding that [the defendant's] threatening conduct was motivated by [the defendant's] position." *Id.* at 86.

Similarly, in *United States v. Talley,* the Sixth Circuit affirmed a § 3A1.2(a) enhancement when the court found that the defendant, who was convicted of soliciting to kill an FBI agent, was motivated "specifically by the desire to eliminate" the FBI agent. *Talley,* 164 F.3d 989, 1004 (6th Cir.

---

[3]While not directly on point, the Ninth Circuit has found that a § 3A1.2(a) enhancement for a felon in possession conviction is inappropriate. *See United States v. Powell,* 6 F.3d 611, 612-13 (9th Cir. 1993) (although the defendant "attempt[ed] to bring the gun to bear on the [officer]," the court found the enhancement "clearly inapplicable -offense of conviction not motivated by official status of the officer whom the defendant assaulted.

1
2   1999). In *Talley,* the defendant knew the FBI agent had incriminating information and was going to

3   testify against the defendant at trial. *Id.* Applying "common sense," the court reasoned that the

4   defendant would want to kill the FBI agent based on the information the FBI agent had obtained in

5   performing his official duties. *Id.* The court found that the defendant was not "motivated by mere

6   personal animus, but specifically by the desire to eliminate an FBI agent." *Id.*

7        The First and Fifth Circuits have made comparable rulings. *See, e.g., United States v. Garcia,*

8   34 F.3d 6, 13 (1st Cir. 1994) (upholding § 3A1.2 enhancement when court found that the offense of

9   conviction was motivated by the officer's status–defendant aimed car at officers and attempted to

10  evade arrest when police approached the vehicle and announced that they were the police); *United*

11  *States v. Polk,* 118 F.3d 286, 297-98 (5th Cir. 1997) (defendant intended to "kill, injure, or maim

12  federal employees in the [building] *solely* because those persons worked for the IRS") (emphasis

13  added).[4]

14       **B.    Mr. Perry's Offense Conduct Was Not Clearly Motivated By The Victim's Status**
              **As An Employee Of The City And County of San Francisco.**
15

16       The evidence in the present case does not establish that Mr. Perry was motivated by the

17  victim's status as a government employee. According to the victim, Mr. Perry asked him to call the

18  police to get him an ambulance. PSR ¶ 13. According to the facts in the PSR, Mr. Perry was

19  apparently motivated by audio hallucinations. Mr. Perry "indicated that he suffered from

20  schizophrenia, and was hearing voices . . . He further stated that he could only remember the

21  beginning and the end of the fight. . . . [and] that the driver pushed him . . . ." PSR ¶ 10.

22  ─────────────────────

23       [4]For additional Fifth Circuit cases, *see United States v. Williams,* 520 F.3d 414, 424 (5th Cir.
     2008) (district court did not err in enhancing offense level because the offense stemmed from the
24   exercise of official duties by the corrections officer where assault emanated from defendant's
     allegation that the officer inappropriately touched defendant in course of pat-down search);; *United*
25   *States v. Hooker,* 997 F.2d 67, 75-6 (5th Cir. 1993) (the defendants' sentences were properly
     enhanced because they assaulted an officer of the Mississippi Bureau of Narcotics while making
26   statements including, "They are the police. Let's kill them.").

DEF. SENT MEM.
No CR 07-0739 CRB                    -11-

The PSR recognizes that Mr. Perry's conduct occurred in the midst of a psychotic episode. PSR ¶ 14.

Indeed, the medical professionals who tended to Mr. Perry after the assault observed him to be "responding to internal stimuli." PSR ¶ 55. Moreover, Dr. Jeremy Coles, who examined Mr. Perry most recently, has concluded that his schizoaffective disorder "substantially impaired his thought, perception of reality, emotional process, and judgment, thereby leading to the violent behavior that he exhibited at the time." Coles Report at 11.

In the cases where Guideline § 3A1.2 properly applies, the defendants display obvious animus towards the victims because of their official capacity. Mr. McAninch displayed animus against the President as President. Mr. Sanchez displayed animus against the border patrol agent because he was a border patrol agent. On the other hand, in the present case, Mr. Perry's conduct could have been just as easily directed against any provider of transportation, regardless of that person's employment status. Indeed, his conduct might have been directed at anyone he encountered. Dr. Coles observed that, when he met a second time with Mr. Perry at the jail, "even this examiner was viewed through Mr. Perry's paranoid lens." Coles Report at 11.

In the final analysis, there is no conclusive evidence that Hakeem Perry was motivated by the victim's status as an employee of the City and County of San Francisco. Instead, the fairest factual conclusion is that the victim's official status was incidental to Mr. Perry's conduct. The sentencing enhancement for an "official victim" should not be applied to Mr. Perry.

Without the six-point enhancement, Mr. Perry's offense level under the sentencing guidelines would be 16, with a criminal history category of III and an advisory sentencing range of 27-33 months.

//

//

1

2  **II.    THE COURT SHOULD IMPOSE A SENTENCE OF TWELVE MONTHS IN LIGHT OF ALL STATUTORY GOALS OF SENTENCING, INCLUDING THE NEED FOR TREATMENT.**

3

4      **A.    The Court Has the Discretion to Impose a Sentence Based on All Statutory Goals, Not Merely Based on the Advisory Guidelines.**

5

6          In light of *United States v. Booker*, 543 U.S. 220, 125 S.Ct. 738 (2005), district courts now

7  have considerable sentencing discretion.  The Ninth Circuit has instructed sentencing courts to

8  undertake a two-step procedure: first a court is to determine the applicable range under the advisory

9  guidelines.  After this starting point, the court is to impose a reasonable sentence, taking into account

10  the various purposes of sentencing, as set forth in Title 18 U.S.C. § 3553(a).  *United States v.*

11  *Mohamed*, 459 F.3rd 979, 985 (9th Cir. 2006) (citing *United States v. Cantrell*, 433 F.3rd 1269, 1279

12  (9th Cir. 2006)).

13          The sentence imposed need not hue to the advisory guidelines.  Instead, "[D]istrict courts must

14  provide specific reasons for their sentencing decisions, such that the record on appeal demonstrates

15  explicit or implicit consideration of the sentencing factors set forth in § 3553(a)." *Mohamed, supra,*

16  at 985.  Moreover, a sentencing decision outside of the advisory range need not be defined in terms of

17  pre-*Booker* guidelines "departures".  The Ninth Circuit has explicitly replaced the old departure

18  scheme with a reasonableness standard based on the sentencing statute:

19
20          We think the better view is to treat the scheme of downward and upward "departures" as essentially replaced by the requirement that judges impose a "reasonable" sentence.  The discretion that the district court judge employs in determining a reasonable sentence will
21          necessarily take into consideration many of the factors enumerated in Section 5K of the Guidelines but to require two exercises–one to calculate what departure would be allowable . .
22          . and then to go through much the same exercise to arrive at a reasonable sentence is redundant.

23

24  *Id.* at 986-87.

25          The Ninth Circuit has clearly concluded that, instead of departures, any sentence outside of the

26

1

2    advisory range is an exercise of discretion:

3    [O]ut of a recognition that the concept of formal departures has become anachronistic, we hold that any deviation from the applicable advisory guidelines range will be viewed as an
4    exercise of the district court's post-*Booker* discretion and reviewed only for reasonableness."

5    *Id.* At 987.

6
7    In the process of arriving at a just sentence in this case, the Court will necessarily be
8    addressing a multiplicity of factors, not just the advisory Sentencing Guidelines.  The Court should
9    impose a sentence that is sufficient, but not greater than necessary, to satisfy the statutory goals of
10   sentencing.  18 U.S.C. § 3553.  The statutory purposes of sentencing include:

11   The nature and circumstances of the offense and the history and characteristics of the defendant . . .  the need for the sentence imposed . . . to reflect the seriousness of the offense,
12   to promote respect for the law, . . . to provide just punishment for the offense . . . to afford adequate deterrence . . . to protect the public . . .  and to provide the defendant with needed . . .
13   medical care or other correctional treatment in the most effective manner . . . .

14   Title 18 U.S.C. § 3553(a).

15
16   B.    **A Twelve-Month Sentence Would Reflect the Seriousness of the Offense, Promote Respect for the Law, Provide Deterrence and Protect the Public While Not Becoming Counterproductive in Light of Rehabilitation and Other Sentencing**
17   **Goals.**

18   The serious injury to the victim certainly requires a serious response, but not a reflexive one.
19   The court should impose a sentence in line with the seriousness of the crime that addresses punitive,
20   deterrent and protective goals balanced with other purposes.  A twelve-month sentence accomplishes
21   those goals.  A year term will be far and away the largest sentence Mr. Perry has ever received.  For
22   his previous three misdemeanors he received 3 days, 10 days and 45 days in jail.  A twelve-month
23   prison term is a considerable increase.  The sentence is large enough to get Mr. Perry's attention, but
24   not so lengthy as to be counterproductive.

25   The goal of deterrence would not be effectively met through a lengthier sentence, given Mr.

26

Perry's mental condition.  Someone motivated by a schizoaffective disorder is not able to govern his behavior based on the memory of past prison time (deterrence).  Just as importantly, given his fragile state, a lengthy prison term might well cause Mr. Perry to further decompensate — without affording any real benefit in terms of long-term improvement in his condition and corresponding long-term protection for society.

C. **Structured, Long-Term Treatment is the Most Important Component of the Sentence the Court Should Impose.**

The most important means of protecting the public from Mr. Perry in the future is through structured long-term treatment, as recommended by Dr. Coles.  Services are available in both San Francisco and Alameda County, provided that Mr. Perry has an advocate, such as his probation officer, to ensure access to treatment.

Since Mr. Perry has been a San Francisco resident, available services by County Mental Health would conform to the following procedure, according to information provided to the undersigned counsel by county personnel and by an intake counselor at Baker Places, one of the private agencies that partners with San Francisco:

1) Mr. Perry would be assigned a case manager through County Mental Health
2) He would be placed in an acute diversion unit for approximately 14 days.
3) He would be placed in a structured residential program for up to one year.
4) He would be eligible for placement in an ongoing supported living program for an indeterminate period of time.

Progress Foundation and Baker Places are examples of two private agencies that partner with San Francisco to provide the above services.  A full description of Progress Foundations programs can be at www.progressfoundation.org.  Details regarding Baker Places are available at www.bakerplaces.org.

The most useful manner in which to address the troubling features of this case and Mr. Perry's

1

2  life is through a sentence that punishes first, but rehabilitates longest.  The suggested sentence,

3  especially with carefully monitored supervised release mental health treatment conditions, is the type

4  of holistic response that represents the best that federal courts can offer.

5                                          **CONCLUSION**

6         For the foregoing reasons, Mr. Perry requests that the Court impose a sentence of 12 months

7  in custody, followed by three years of supervised release.  Supervised release conditions should

8  include at least one year of residential psychiatric care.

9  Dated: August 1, 2008

10

11                                             Respectfully submitted,

12                                             BARRY J. PORTMAN
                                               Federal Public Defender
13

14                                                  /S/

15
                                               RONALD C. TYLER
16                                             Assistant Federal Public Defender

17

18

19

20

21

22

23

24

25

26

DEF. SENT MEM.
No CR 07-0739 CRB                        -16-