<u>Exhibit A</u>

# JEREMY COLES, PH.D.
## CLINICAL & FORENSIC PSYCHOLOGIST
PSY15992
### 6114 La Salle Ave # 587
### Oakland, CA 94611
### 510-339-6733

## CONFIDENTIAL REPORT OF PSYCHOLOGICAL EVALUATION

| | |
|---|---|
| **Name:** | **Hakeem Perry** |
| **Date of Birth:** | **05/25/1985** |
| **Age:** | **23 years old** |
| **Gender:** | **Male** |
| **Case Number:** | **CR-07-0739- CRB** |
| **Date of Testing:** | **04/04/2008, 05/19/2008** |
| **Date of Report:** | **05/28/2008** |
| **Assessment Procedures:** | **Clinical Interview** |
| | **Millon Clinical Multiaxial Inventory ("MCMI-III")** |
| | **Cognistat** |

## IDENTIFYING INFORMATION AND REFERRAL QUESTIONS

Mr. Hakeem Perry is a 23 year-old African-American male who was referred for psychological evaluation by Assistant Federal Public Defender, Ron Tyler, who is representing him on the charge of 18 U.S.C. Title 18 United States Code Section 113(a)(6) - Assault Resulting in Serious Bodily Injury. The purpose of the current evaluation was to assess Mr. Perry's general psychological and cognitive functioning in an effort to determine whether either may have played a role in the commission of the controlling offense and thereby provide a basis for a downward departure during sentencing. Additionally, questions were raised regarding treatment planning issues.

Mr. Perry was evaluated by this examiner in a private interview room at the Santa Rita Jail in Dublin, California on 04/04/2008 and again on 05/19/2008. The total time for both interviews was two and a half hours. Mr. Perry was explained the purpose of the evaluation as well as the limits of confidentiality. He presented as a withdrawn, internally preoccupied young man who agreed to be evaluated, but ended both sessions early, in one instance due to somatic complaints, and in another, due to paranoia. For this reason, I was unable to conduct some of the tests that I had planned to conduct.

## ASSESSMENT PROCEDURES

**Documents Reviewed**

1. Casa Rohnert Park Psychiatric Progress Notes: 08/31/2007-09/18/2007
2. San Francisco General Hospital ("SFGH") Psychiatric Emergency Services ("PES") Four Hour Reassessment Note: 11/08/2007
3. SFGH PES Clinical Assessment: 11/08/2007
4. SFGH PES Physician Summary: 11/08/2007
5. SFGH PES Physician's Orders: 11/08/2007
6. SFGH Four Hour Reassessment Note: 11/09/2007
7. SFGH PES Clinical Assessment: 05/26/2007
8. SFGH PES Physician Exit note: 05/26/2007
9. SFGH PES Clinical Assessment: 11/23/2005
10. SFGH PES Physician Summary and Medication: 11/23/2005
11. SFGH Safety/Restraint Flow Sheet: 11/23/2005
12. Department of Mental Health ("DMH") Detainment Advisement: 11/23/2005
13. Casa Phoenix Progress Notes: 10/09/2007-10/16/2007
14. Telecare Heritage Psychiatric Health Facility Admission Summary: 10/16/2007
15. Telecare Heritage Psychiatric Health Facility Nursing Admission Assessment: 10/16/2007
16. Telecare Heritage Psychiatric Health Facility History and Physical Examination: 04/09/2007
17. Telecare Heritage Psychiatric Health Facility Discharge Summary: 10/31/2007
18. Telecare Heritage Psychiatric Health Facility Physician Orders: 10/16/2007
19. Kaiser Hospital Emergency Department Records: 04/18/2008
20. Kaiser Hospital Emergency Room Psychiatric Consultation: 10/15/2007
21. Alameda County Medical Center ("ACMC") Discharge Summary: 10/22/2007
22. ACMC Discharge Summary: 01/12/2006
23. ACMC Psychiatric Emergency Note: 10/19/2007
24. ACMC Intake Evaluation: 10/19/2007
25. ACMC Intake Evaluation: 03/20/2007
26. ACMC Physician's Orders: 2006-2007
27. ACMC History and Physical Examination: no date
28. ACMC Progress Notes: 01/09/2006
29. Fremont Hospital Discharge Summary: 12/07/2007
30. Fremont Hospital Discharge Summary: 10/29/2007
31. Fremont Hospital Discharge Summary: 05/16/2007
32. Fremont Hospital Discharge Summary: 04/19/2007
33. Fremont Hospital History and Physical: 10/22/2007
34. Fremont Hospital History and Physical: 10/05/2007

35. **Fremont Hospital Psychiatric Evaluation: 10/18/2007**
36. **Letter to Court by Lea Janay Williams-Pinkston: 01/03/2007**
37. **Letter to Court by Zerah Rufus: 12/30/2006**
38. **Letter to Court by Keeley Williams: 01/02/2007**
39. **Letter to Court by Cynthia Persley: 01/03/2007**
40. **Letter to Court by Anthony Owens Williams: 01/04/2007**
41. **Kaiser Vallejo Outpatient Program Progress Notes: 07/09/2007, 07/12/2007**

## CURRENT SITUATION AND PERTINENT BACKGROUND

The following information was obtained from Mr. Perry during the two clinical interviews that this examiner conducted. Notably, some of the information that he provided contradicted the information that was in his record. As will be discussed, he appeared internally preoccupied and paranoid during both interviews with this examiner and this limited his ability to provide accurate historical information.

**Pertinent Family and Social History.** Mr. Perry was born and raised in San Francisco, California. He told this examiner that he is an only child. When I pointed out that his mother had previously reported that he saw his brother die and that this had a profound effect on him, he nodded, but would not comment on this and he became visibly upset. He stated that his parents separated when he was very young and he lived with his mother after this time. She never remarried. He stated that he had some contact with his father after this: "Every once in a while." He stated that his father did not provide any parenting. His father worked as a maintenance man. Currently, Mr. Perry has no contact with his father. He stated that he saw him about a year ago. Mr. Perry stated that he doesn't know what sort of work his mother does.

When queried whether he suffered physical, sexual, or emotional abuse as a child, Mr. Perry responded: "I got physically abused a lot." He stated that his mother would lock him in his room. He stated that he would be hit by her with her fist and various objects. He stated that he was injured enough on occasions to wind up in emergency rooms. He stated that he did not remember Child Protective Services being called and he was never placed in foster care due to this abuse. Mr. Perry stated that this abuse continued throughout his childhood. When queried how this affected him, he stated: "I don't know. Maybe it made me start hearing voices or something." I asked Mr. Perry if he felt loved at all by his mother, to which he responded: "I try not to think about that." Notably, when I asked him about this abuse during the second interview, he denied that he had ever made statements suggesting that his mother abused him.

Mr. Perry did not have friends while he was growing up. He felt socially isolated and recalled being picked on a lot. He stated that he can't recall what he was picked on for, but said that he got beat up a lot. Mr. Perry stated that his only hobby as a youngster was playing chess. Mr. Perry denied all legal trouble as a juvenile. He denied that he ever

---

engaged in behavior typically associated with conduct-disordered youth such as setting fires, chronic stealing, running away from home, or animal torture.

Mr. Perry stated that he did not do well in school. He stated that he was placed in special education classes for the majority of his school years. He stated that he was never a behavioral problem in school and that he was never suspended or expelled from school. He stated that he attended school until the 11th grade. He left because "I wasn't able to concentrate. I was hearing too many voices."

When asked what he did after he left high school, Mr. Perry stated: "I really don't pursue things. I just have to figure out what is going on with my mental capabilities." He stated that he has lived with his mother his entire life. He was unable to describe what he does during the day, but did say that he generally spends time alone. He stated that he sometimes likes to watch sitcoms on television.

**Psychiatric History.** Mr. Perry stated that he was first sent to a psychologist when he was five years old due to depression and auditory hallucinations. He stated he was given medication, but couldn't remember what kind. He stated that he saw a psychiatrist "off and on for a while and sometimes I went to the school therapist." He stated that he saw a psychologist throughout his childhood. He was never placed in a residential setting. He stated that in addition to experiencing auditory hallucinations as a child, he was intermittently suicidal and attempted to overdose on a few occasions by taking pills.

Mr. Perry stated that he was hospitalized for psychiatric reasons on multiple occasions during his childhood. He stated that he couldn't recall where he was sent or why. However, he believed that these hospitalizations related to the auditory hallucinations that he experienced; typically voices telling him to hurt himself. He stated that sometimes they tell him to "do things so I wouldn't feel pain." When asked for an example, he responded: "Walking into a wall or something."

**Medical History.** Mr. Perry stated that he is physically healthy. He is not taking any prescribed medications for physical ailments. He has no history of major surgeries or head injury. He has no history of seizures.

**Substance Abuse History.** Mr. Perry stated that he couldn't remember the first time that he consumed alcohol. He stated that he was never much of a drinker despite the fact that he had been arrested for alcohol related matters. He denied that he has ever been recommended for or ordered into substance abuse treatment. He stated that he has never experimented with illegal drugs.

**Work History.**  Mr. Perry stated that he has no history of employment.

**Relationship History.** Mr. Perry stated that he has never had a girlfriend and has never had sexual relations.  When asked if he has ever had sexual desires, he stated: "I am not

really sure." When asked further about this, he stated: "I haven't really wanted to have sex." He stated that he has no desire to be in an intimate relationship. When asked why, he stated that he had never really thought about it.

**Legal History.** Mr. Perry stated that he has no juvenile arrest record. He was detained once at the age of 19 for being drunk in public.

When I queried Mr. Perry about an incident referenced in his psychiatric records regarding an alleged attack on a BART passenger, Mr. Perry responded: "That was a misunderstanding. They didn't prosecute me. Some drunk guy was assaulting people in the BART. He wanted me to give him money and I was restraining him."

**Controlling Offense and Precursors.** When queried about the controlling offense by the current examiner, Mr. Perry replied that he was "in an altercation" with a bus driver because he was "trying to persuade him to take me to a hospital but he wouldn't… I was running low on my meds." At the time of the incident, he was hearing voices of an unknown person telling him that he should get on his medication. He stated that this voice was making him anxious and noted he had not taken his medication for a couple of days, having lost the medication that he had previously been prescribed. He stated that he felt that he needed inpatient treatment as well as medication. He stated he was feeling "loopy…I wanted to get some steps, some advice from a doctor." Notably, he had recently been discharged home after a psychiatric hospitalization without a firm aftercare plan in place.

I asked Mr. Perry to describe what he was experiencing at the time that he was involved in the altercation with the bus driver, to which he responded: "I know this is going to sound cliché, but he attacked me and I was defending myself. (Why did he attack you?) I guess he felt threatened. (Were you threatening him?) No."

**Plans for Release.** Mr. Perry told this examiner that he did not have well-defined plans for the future, but that he wanted to get psychiatric help and "start to feel stable." He said he was not sure what options he had available to him, but that, upon release, "I would probably check myself into a hospital, get some life skills, get some therapy and medication and go back to my mom's house."   When questioned about going to a place like Villa Fairmont, a long-term residential center, he replied, "I would like to go there."

## DOCUMENT REVIEW

Mr. Perry has an extensive history of psychiatric hospitalizations and placements in recent years. The following information regarding these hospitalizations and placements was obtained from the documents listed above.

On 01/03/2006, Mr. Perry was admitted to Alameda County Medical Center after he attempted to jump from a moving car and also attempted to hit his younger brother. He was taken to Psychiatric Emergency Service where he was noted to be internally preoccupied and laughing inappropriately. During his stay in the hospital, he was noted to be impulsive and uncooperative, talking to himself and refusing medication. He was treated until 01/09/2006, at which time he was discharged to a homeless shelter. His discharge diagnoses were Impulse Control Disorder and Substance Induced Disorder with perceptual disturbance. He was prescribed Depakote, a mood stabilizer.

On 03/20/2007, Mr. Perry was admitted to Alameda County Medical Center after complaining of suicidal ideation. He was noted to be depressed and paranoid. He told the intake evaluator that he was living in a Board and Care and became paranoid about some of the other residents, but he did not elaborate. He noted that he was having suicidal thoughts for about a year and was unable to contract for safety. He stated that he wanted to be sent to Villa Fairmont, a long-term residential center for psychiatrically disturbed individuals. He was placed on a 5150 as a danger to himself and transferred to Fremont Hospital. His discharge medication included an antipsychotic medication and antidepressant medication. His primary Axis I diagnosis was Schizoaffective Disorder.

Mr. Perry was admitted to Fremont Hospital on 03/21/2007, where he remained until 03/30/2007. His chief complaint was that he felt unsafe. He stated that he was feeling timid around people in his Board and Care. He was prescribed Remeron, Zyprexa and Abilify. According to records from this admission, his psychiatric symptoms persisted and his Zyprexa dosage was increased on 03/24/2007. He continued to be paranoid and complained of hearing voices. He was eager to leave the hospital, but had no plan. Ultimately, his symptoms lessened enough to allow for his discharge. He was discharged to a shelter. His diagnosis at the time of his discharge was Schizophrenia, paranoid type.

Mr. Perry was admitted to Fremont Hospital on 03/31/2007 as a danger to himself after he became paranoid and suicidal. Apparently, after being discharged from this facility one day prior, he went to a shelter and began experiencing auditory hallucinations of a self-deprecatory and ultimately suicidal nature. He stopped taking his medication and his symptoms worsened. He was treated with Remeron and Abilify and was discharged on 04/03/2007 with a discharge diagnosis of Psychosis NOS.

Mr. Perry was admitted to Telecare Heritage Psychiatric Health Facility on 04/09/2007. He was admitted on a 5150 as gravely disabled. Notably, he had been discharged from Fremont Hospital a few days prior. At the time of admission, he stated that he had given up on life and that he wanted to go to Villa Fairmont. It was noted he had nowhere else to go and that his mother had a restraining order against him. His father lived in New Jersey. A history of three back-to-back, recent admissions to Fremont Hospital was noted. Apparently, Mr. Perry had been most recently discharged to a shelter that he did not make it to and had stopped taking his medication.

Mr. Perry remained at Telecare Heritage Psychiatric Health Facility for a little over one week, until 04/17/2007. During his stay, he was treated with Risperdal, an antipsychotic and Zoloft, an antidepressant. The Discharge Summary from this hospital admission reads:

> The patient did not do much good on these medications. He continued to be quite delusional, paranoid, internally preoccupied and had very poor insight into his problem. We did contact his mother who was very angry on the phone that she did not want to talk to anyone but him. She had a restraining order against him...At this point, we are looking for a shelter for him where we can place this patient. The patient was willing to go to the shelter which was more organized. At this point he was not suicidal. Most of the tests came out to be normal. He was sleeping through the night and was not having any auditory or visual hallucinations or paranoid ideation.

Mr. Perry's discharge diagnosis was Schizoaffective Disorder. He was discharged with medication orders for Risperdal and Zoloft.

The next day, on 04/18/2007, Mr. Perry went to Kaiser Hospital complaining of depression and suicidal thoughts. He was then admitted to Fremont Hospital and remained there until 04/30/2007. Notes from this hospitalization indicated that he started hearing voices and became medication non-compliant. He was noted to be confused and disorganized. He expressed a desire to go to Villa Fairmont. However, the fact that he was not on a conservatorship limited this as a real possibility. Mr. Perry was treated with Depakote. His diagnosis during this hospital stay was Schizoaffective Disorder. He was discharged to a Board and Care facility.

Records from the Kaiser Vallejo Outpatient Program, dated 07/09/2007, indicated that Mr. Perry self-referred himself to the Intensive Outpatient Program complaining of depression and auditory hallucinations. He was diagnosed with Schizoaffective Disorder and prescribed antipsychotic medication.

Mr. Perry was admitted to Casa Rohnert Park Hospital, on 08/29/2007. He was referred from an outpatient clinic. His admitting diagnosis was Psychotic Disorder NOS. He was treated with Zyprexa, an antipsychotic medication. Notes from this hospitalization indicated a history of auditory hallucinations and paranoia. According to a psychiatric progress note, dated 09/18/2007, Mr. Perry had stabilized during this hospitalization. His psychiatrist noted that he was unwilling to initiate a rep payee against Mr. Perry's wishes without evidence of attempts to manage his own funds and a demonstrated failure. He was then discharged.

Mr. Perry was admitted to Fremont Hospital on 10/02/2007 and remained there until 10/08/2007. He was admitted after presenting in an emergency room complaining of auditory hallucinations and feeling suicidal. It was noted that he had not taken his

medication after discharging from Casa Rohnert Park. He was homeless at the time of his admission. During his stay in Fremont Hospital, he was medicated with Zyprexa, Zoloft and Depakote. His diagnosis was Schizophrenia, chronic paranoid type. Ultimately, he was discharged to a Board and Care facility.

Mr. Perry was admitted to Telecare Heritage Psychiatric Facility on 10/16/2007 after he complained that he was hearing voices telling him to kill himself. He was placed on a 5150 as a danger to himself. He stated that he was sad and suicidal because his mother did not want anything to do with him. He also complained the medication that he was taking, Zyprexa, was not working. His admitting diagnosis was Schizoaffective Disorder. He remained in the hospital for one day and was transferred to Fremont Hospital for reasons related to the "insurance process."

Mr. Perry was admitted to Fremont Hospital on 10/17/2007 and discharged the following day. The Discharge Summary from this hospitalization indicated that Mr. Perry had recently been discharged from Fremont Hospital. However, the plan for subsequent care fell through and his psychiatric illness worsened. He became suicidal and his auditory hallucinations returned. Mr. Perry was treated with antipsychotic medication and a mood stabilizer. His status was changed from involuntary to voluntary and, on 10/18/2007 he requested to leave the hospital. It was noted that he did not meet the criteria for involuntary hospitalization, as he was not longer complaining of suicidal ideation. However, he was discharged against medical advice. He was set up with an appointment in the Kaiser Hospital Intensive Outpatient Program for 10/19/2007. His discharge diagnosis was Schizophrenia, chronic, undifferentiated.

On 10/19/2007, Mr. Perry was admitted to Alameda County Medical Center. He was brought there by police after, unprovoked, he assaulted someone in the BART station. Upon admission, he claimed to hear voices and was noted to laugh inappropriately. He was internally preoccupied and was described as loose and disorganized. He was noted to be paranoid with persecutory ideation. He was treated with antipsychotic medication three days later and discharged to Santa Rita Jail in Dublin, California. His discharge diagnosis was Schizophrenia, paranoid type.

Mr. Perry was admitted to the SFGH PES on a 5150 on 11/08/2007 after committing the controlling offense. During this offense, he seriously assaulted a MUNI bus driver after he refused to drive him to a psychiatric hospital. In PES, Mr. Perry presented as internally preoccupied. He admitted experiencing auditory hallucinations as well as visual hallucinations. He was noted to have a bland affect when discussing the assault of the bus driver and maintained that the bus driver pushed him. He denied that he had any urges to harm anyone. His admitting diagnosis was Schizophrenia, paranoid type.

## TEST SESSION BEHAVIOR AND MENTAL STATUS EXAMINATION

This examiner interviewed Mr. Perry on two occasions at the Santa Rita Jail in Dublin, California. He presented as a man of medium height and build who remained handcuffed during the interviews. He had a scraggly beard. His grooming skills appeared to be adequate. He was dressed in typical jail garb.

During the first interview with this examiner, Mr. Perry was distracted by people walking around outside of the examination room. He often looked out the glass window and laughed to himself. He fidgeted in his chair a good deal and appeared very anxious. His speech was hesitant and halting. He made minimal eye contact with this examiner. Most of the time, he stared at the floor. He laughed a good deal at inappropriate times and, although he denied that he was experiencing auditory hallucinations during the interview with this examiner, he appeared to be responding to internal stimulation. His attention and concentration was impaired. He had a difficult time following the flow of our conversation. His recent memory was impaired. He denied current suicidal or homicidal ideation. His insight was minimal. By history, his judgment can be poor. During the administration of the MCMI-III, Mr. Perry answered a few of the items and then told this examiner that he couldn't complete the test because it was giving him a headache. I then read the questions to him and he finished most of the test. However, towards the end, he requested to leave the examination room because he was feeling stomach pains and felt as though he was going to throw up. I asked him if he felt able to stay for a little longer and he responded that he really wanted to leave. I discontinued the testing for that day.

When I returned to interview Mr. Perry on a later date, he presented as much more paranoid and interpersonally removed. Initially, he laughed to himself and again appeared to be responding to internal stimuli. He soon became agitated when I asked him to elaborate on historical information and pointed out some of the inconsistencies between what he had told me the last time I met with him and during the current interview. He appeared to become overwhelmed by his paranoia and told me that he didn't want to speak with me anymore. He also declined to sign a Release of Information form so that I could view his jail medical record.

## COGNITIVE FUNCTIONING

Mr. Perry was administered the Cognistat, a neurobehavioral cognitive status examination, in an effort to assess his basic cognitive capacities in all of the major cognitive domains. The results are listed below:

### COGNISTAT COGNITIVE STATUS PROFILE

| | |
|---|---|
| **LEVEL OF CONSCIOUSNESS:** | **Alert** |
| **ORIENTATION:** | **Mild Impairment** |

| | |
|---|---|
| **ATTENTION:** | **Mild Impairment** |
| **LANGUAGE: Comprehension:** | **Within Average Range** |
| **Repetition:** | **Within Average Range** |
| **Naming:** | **Within Average Range** |
| **CONSTRUCTIONAL ABILITY:** | **Moderate Impairment** |
| **MEMORY:** | **Moderate Impairment** |
| **CALCULATIONS:** | **Mild Impairment** |
| **REASONING:    Similarities:** | **Moderate Impairment** |
| **Judgment:** | **Within Average Range** |

Mr. Perry's performance on the Cognistat revealed multiple areas of cognitive impairment. That said, it is my opinion that his psychological difficulties are extremely pronounced at present and are most likely the main contributor to his cognitive problems. That is to say, if his symptoms were being controlled by medication, it is likely that his cognition would substantially improve.

## BEHAVIORAL AND EMOTIONAL FUNCTIONING

The current evaluation revealed a severely mentally disturbed young man who has required ongoing psychiatric care throughout his short adult life. His symptom profile fits the diagnostic criteria for Schizoaffective Disorder. In this regard, the *Diagnostic and Statistical Manual of Mental Disorders - Fourth Edition - Text Revision* (DSM IV-TR) describes Schizoaffective Disorder as:

A.    An uninterrupted period of illness during which, at some time, there is either a Major Depressive Episode, a Manic Episode, or a Mixed Episode concurrent with symptoms that meet Criterion A for Schizophrenia. (Evaluator's Note: Schizophrenia Criterion A is defined by a 1-month period of two or more of the following: delusions, hallucinations, disorganized speech, grossly disorganized or catatonic behavior, negative symptoms, i.e. affective flattening)

B.    During the same period of illness, there have been delusions or hallucinations for at least 2 weeks in the absence of prominent mood symptoms.

C.    Symptoms that meet criteria for a mood episode are present for a substantial portion of the total duration of the active and residual periods of illness.

D.    The disturbance is not due to the direct physiological effects of a substance or a general medical condition.

Mr. Perry had demonstrated prominent symptoms of a mood disorder and a psychotic disorder. In terms of the former, he has expressed suicidal ideation and hopelessness;

hallmark features of major depression. In terms of the latter, he has complained of ongoing auditory hallucinations and has been noted to be internally preoccupied, with a loose and disorganized thought process. Additionally, he has been noted to be extremely paranoid at times.

At the time of his recent attack of a bus driver, Mr., Perry requested that the bus driver take him to a psychiatric hospital and, when he refused, Mr. Perry beat him up badly. While Mr. Perry's report to this examiner regarding his thought process at the time of this crime was generally non-illuminating, his history is quite clear regarding his paranoia and poor reality testing, his suspicion of others, etc. His psychosis is marked by significant feelings of persecution that vacillate between self-persecution leading to suicidality and external persecution that causes him to view others as a real threat. Notably, even this examiner was viewed through Mr. Perry's paranoid lens during our second meeting. Unfortunately, the victim of his controlling offense, the bus driver, became the focal point of Mr. Perry's paranoia, came to be seen as a threat, and was injured in the process. It is my opinion that Mr. Perry's Schizoaffective Disorder was significantly related to his commission of the controlling offense in that it substantially impaired his thought, perception of reality, emotional process, and judgment, thereby leading to the violent behavior that he exhibited at the time of the aforementioned offense.

Undoubtedly, the death of Mr. Perry's older brother, a death that he witnessed, has played a significant and detrimental role in his psychological life, prompting some depressive symptoms to exacerbate. That said, the severity and persistence of his psychological problems, specifically his psychotic symptoms, indicate that his mental illness is biologically rooted and not solely the result of early childhood trauma. His record and current presentation reveal him to be a chronically disturbed young man who experiences ongoing psychotic symptomatology that has not responded quickly to psychotropic medication. It is my opinion that Mr. Perry's mental health liabilities are chronic and will need continual monitoring and treatment throughout his life.

Mr. Perry's psychiatric hospitalization history over the past two years highlights the utter failure of the existing mental health apparatus to effectively deal with an individual such as Mr. Perry who expresses a desire for treatment and also a significant resistance to treatment. His revolving door of psychiatric admissions is quite common for individuals whose mental illness is marked by paranoia and suicidality. At one moment, he gives up all hope, becomes suicidally depressed, and enters a hospital. He requests long-term locked care but, when left to his own devices, can't follow through with less restrictive care. He becomes quickly disorganized in stressful environments such as shelters, the street, or Board and Care, and soon stops taking his medication and goes back to the hospital. Here it is worth noting that Mr. Perry's record contained several entries that document his self-declared desire to go to Villa Fairmont, a locked, long-term facility in Alameda County. If he had been afforded this opportunity, his controlling offense could have been avoided. For reasons that remain unclear to this examiner, he was not considered appropriate for this program. Having done psychological testing at Villa

Fairmont as well as having placed people in this facility, it is my opinion that he was very appropriate for this program.

This examiner has worked as a treatment coordinator for several years in a local psychiatric hospital and is well aware of the general push to get patients out of the hospital as soon as possible due to insurance and monetary constraints. Unfortunately, for people such as Mr. Perry and his two violent crime victims, this push ultimately results in harm. Most unsuccessfully treated psychotic patients don't turn violent in the midst of their psychosis. However, some as Mr. Perry do in part because their paranoia becomes so pronounced that the outside world is viewed as threatening and provokes a hostile and aggressive response. It is also worth noting that Mr. Perry's mental illness does not respond quickly to medication and his record reflects the fact that he has most often been discharged back into the community prior to his being truly stabilized.

## SUMMARY AND RECOMMENDATIONS

Mr. Perry is a 23-year-old African-American male who is currently charged with 18 U.S.C. Title 18 United States Code Section 113(a)(6) - Assault Resulting in Serious Bodily Injury. He was referred for psychological evaluation in an effort to assess his cognitive and psychological functioning as well as to provide treatment planning recommendations. The current evaluation revealed Mr. Perry to be a young man afflicted with Schizoaffective Disorder, a chronic mental illness that will need ongoing monitoring and treatment for the rest of his life.

Mr. Perry will not fair well in the general population of any prison setting and, given his propensity for suicidal ideation and psychosis, would likely regress to a state of suicidality in very short order. It is my opinion that he will need to be treated in a skilled psychiatric setting in prison that will provide ongoing care for him and will not continue the pattern that was set up in the community whereby any time that Mr. Perry is doing slightly better, he is allowed to rely on himself to get his treatment needs met.

Once released into the community, Mr. Perry should be provided with a structured long-term residential setting that will provide him with complete psychiatric services as well as transitional services aimed at integrating him into the community. Such services should include vocational training. It is absolutely essential that Mr. Perry not be subjected to the revolving door of the mental health system. For all of the reasons illuminated above, he does not respond well to such a system and is in need of far more structured and intensive psychiatric care. To date, he has not received such care and it is my deep hope that his future holds more than a simple repetition of the past.

Please feel free to call this examiner with any questions or comments.

---

Respectfully Submitted,

Jeremy Coles, Ph.D.